# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

WESTERN SECTION
CIVIL ACTION
NO

## 05 - 30199 - KPN

ADELHEID (HEIDI) TEUTSCH,
                 *Plaintiff*

v.

KARL G. COOPER, JR., Individually & in
his Official Capacity as Chief of Police of
the West Stockbridge Police Department,

CHARLES SIMONELLI, Individually & in
his Official Capacity as a Police Officer for
the West Stockbridge Police Department,

TOWN OF WEST STOCKBRIDGE,

                 *Defendants*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

FILING FEE PAID:
RECEIPT # 306040
AMOUNT $ 250.00
BY DPTY CLK MFL
DATE 9/12/05

## *COMPLAINT AND DEMAND FOR A JURY TRIAL*

## I.    JURISDICTION

1.    This is an action under Title VII -- 42 U.S.C. § 2000e-2(a) & 3. The plaintiff further

invokes the pendent jurisdiction of this Court to consider the claims arising under state

law, M.G.L. Chapter 151B, M.G.L. Chapter 12 §§ 11 H & I, as well as common law

claims.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1367.

2.    There exists between the parties an actual controversy justiciable in nature.

1

## II.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

3.    On or about March 9, 2005, the plaintiff, Adelheid (Heidi) Teutsch, filed a Complaint at both the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission (hereinafter referred to as the "MCAD" and "EEOC", respectively), charging that the defendants subjected her discriminatory treatment, sexual harassment, a sexually hostile work environment, and retaliated against because she opposed and complained of the defendants' unlawful and discriminatory treatment and employment practices.

4.    On or about June 20, 2005, the MCAD and EEOC issued a right to sue notice at the plaintiff's request.

## III.    PARTIES

5.    The plaintiff, ADELHEID (HEIDI) TEUTSCH, has at all times relevant to the allegations of this Complaint been a Police Officer employed by the Town of West Stockbridge Police Department, and a resident of the Town of Richmond, Berkshire County, in the Commonwealth of Massachusetts.

6.    The defendant, KARL G. COOPER, JR., has at all times relevant to the allegations of this Complaint been the Chief of Police, acting under color of law, as an agent/employee for the Town of West Stockbridge Police Department, Berkshire County, in the Commonwealth of Massachusetts. In his capacity as Chief of Police, KARL G. COOPER, JR., is the principal law enforcement administrator for the Town of West Stockbridge, and, as such, is at all times relevant to the allegations of this Complaint, responsible for the practices, customs and policies of the Town of West Stockbridge

2

Police Department and all of its individual members, including adequate training, supervising, investigating, and disciplining of police officers and other police supervisory officials.

7. The defendant, CHARLES SIMONELLI, has at all times relevant to the allegations been a senior police officer, acting under color of law, as an agent/employee for the Town of West Stockbridge Police Department, Berkshire County, in the Commonwealth of Massachusetts.

8. The defendant, TOWN OF WEST STOCKBRIDGE, has at all times relevant to the allegations of this Complaint been a Municipal Corporation duly established under the laws of the Commonwealth of Massachusetts. The Town of West Stockbridge, through its officers, employees and/or agents, was at all times responsible for the practices, customs and policies of the Town of West Stockbridge Police Department and all of its individual members including adequate training, supervising, investigating and disciplining of the chief of police, police supervisory officials and police officers.

IV. **STATEMENT OF FACTS**

**Background:**

9. Plaintiff, Adelheid (Heidi) Teutsch, was hired as a police officer by the West Stockbridge Police Department on February 2, 2003.

10. Upon information, prior to the plaintiff's employment, the West Stockbridge Police Department had two women employed as police officers. Both women were eliminated from the shift schedule in early 1999 when defendant Karl G. Cooper, Jr. assumed the job duties of Acting Chief of Police. Upon information, former Senior Police Officer Sheryl

E. Johnson submitted a letter of resignation that complained of defendant Chief of Police Cooper's discriminatory employment practices towards women. Police Officer Johnson specifically alleged that she was resigning because defendant Chief of Police Cooper had eliminated all female police officers from the work schedule when he assumed the duties of Chief of Police [prior to his official appointment date in March/April 1999]. In addition, upon information, defendant Chief of Police Cooper advised a male police officer that he "was getting rid of all the women because he could not trust himself to be around them....because he will end up with a sexual harassment suit."

11.    At the time the plaintiff was hired, defendant Chief of Police Karl G. Cooper, Jr. advised the plaintiff that he hired her because defendant Town of West Stockbridge officials had lodged complaints against him regarding his sexist attitude towards women working in the police department. Specifically, defendant Chief of Police Cooper advised the plaintiff that he was glad to have her in the department, because Town officials called him a "sexist" because no females had worked in the West Stockbridge Police Department during his entire tenure of employment as Chief of Police.

12.    At the time the plaintiff was hired, defendant Chief of Police Cooper further advised the plaintiff that she would be guaranteed three full days of work as a West Stockbridge Police Officer. Defendant Chief of Police Cooper also specifically assured the plaintiff that she could work for other police and public safety departments in order to create a full 40 hour workweek.

13.    *After being hired and throughout the course of her employment, the plaintiff was*
       *subjected to discriminatory treatment because of her gender. A background summary*
       *of some of the unlawful and discriminatory employment practices is as follows:*

    1) Despite the fact that defendant Chief of Police Cooper assured the plaintiff that
she could work for other police and public safety departments in order to create a
full 40 hour workweek, after the plaintiff was hired, defendant Chief of Police
Cooper became angry when he learned that the plaintiff was applying for part-
time jobs in other police departments. He told the plaintiff that she was not
allowed to seek any other part-time employment unless the other job(s) were
cleared through him first. The plaintiff assured defendant Chief of Police Cooper
that her position in the West Stockbridge Police Department was her first priority,
and a second job would not conflict in any way. The plaintiff also advised
defendant Chief of Police Cooper that she would gladly work more hours at the
West Stockbridge Police Department, which he said was not an option. During
her entire period of employment at the West Stockbridge Police Department,
defendant Chief of Police Cooper only approved one eight-hour position as an
E.M.T. with the Lenox Fire Department, which left the plaintiff unable to meet
her financial needs and that of her young son. Defendant Chief of Police Cooper
further threatened that if the plaintiff took part-time positions with other police
departments, she would be fired. In this regard, defendant Chief of Police Cooper
directly interfered with and/or opposed various part-time law enforcement
positions that the plaintiff was seeking, including but not limited to positions, at

the Stockbridge Police Department, Lenox Police Department, and the Great Barrington Police Department.

2) **All full and part-time male police officers [including those hired after the plaintiff] held outside jobs, and yet were not required to obtain defendant Chief of Police Cooper's approval for outside employment.**

3) Since defendant Chief of Police Cooper refused to approve outside employment for the plaintiff, she repeatedly asked to work additional shifts, which she had been told [at the time she was hired] would be possible if day shifts or any other shifts became open. In October 2003, it became wholly apparent that she would not be allowed to work day shifts when defendant Chief of Police Cooper told the plaintiff that she would only be allowed to work a day shift '*if he died.*'

4) Despite the fact that shifts and details were assigned on a seniority basis, defendant Chief of Police Cooper consistently gave preference to both Steven Cabral and Brian Tenney [part-time police officers who were hired after the plaintiff] when assigning both shifts and details throughout the entire time that the plaintiff worked for the department. **The plaintiff protested this discriminatory practice.**

5) **Further, despite the fact that the plaintiff repeatedly made requests to work extra shifts and details, defendant Chief of Police Cooper consistently assigned extra shifts and details to males with less seniority.**

6) The plaintiff's repeated requests to work details, likewise went unheeded. Again, details were not granted on a seniority basis. When the plaintiff was permitted to work details, she was not paid for the details that she worked. After months of

complaining and protesting the failure of defendant Chief of Police Cooper to pay her for the details that she worked, the plaintiff finally received some payment for some details worked. When the plaintiff continued to voice complaints about the failure to be paid for all details worked, defendant Chief of Police Cooper told the plaintiff on several occasions that he "*would look into it,*" or that "*it was too late to fix the problem.*" **All male police officers were paid in full and in a timely manner for all details worked.**

7) After a series of discussions and many months of complaints regarding the failure to be paid for all details worked, the plaintiff was finally paid for the extra details in one lump sum. Since the back pay from these details was paid in one lump sum, the plaintiff lost her health insurance through MassHealth. When the plaintiff learned of this, she spoke to defendant Chief of Police Cooper about the problem. Since the plaintiff had consistently been working 24-hour workweeks, in the spring 2003, she requested that she receive health insurance from the Town. [The Town's policy at the time was that if an employee worked 20 hours per week, health insurance would be provided]. Defendant Chief of Police Cooper advised the plaintiff that he would raise her request for health insurance coverage with the Board of Selectmen. On July 28, 2004, the plaintiff again approached defendant Chief of Police Cooper about her loss of health insurance, and her request for health insurance coverage through the Town. Defendant Chief of Police Cooper advised the plaintiff that he had spoken with the Board Selectmen, but that they had not responded to him, and for this reason he took this lack of an answer to mean "*no.*"

7

8) **Defendant Chief of Police Cooper regularly offered males with less seniority over night on-call shifts. Defendant Chief of Police Cooper never offered these shifts to the plaintiff. When the plaintiff protested this discriminatory practice, defendant Chief of Police Cooper's response was that he *"did not believe that she could handle it."*** After a period of approximately one year and repeated protests, defendant Chief of Police Cooper finally offered the plaintiff one over night on-call shift, and stated that he *"thought she could handle it now."*

9) After the plaintiff learned that the department had enough money to support two full time officers, the plaintiff met with defendant Chief of Police Cooper in reference to becoming a full time police officer and/or the possibility of working toward full time employment. **During the meeting, defendant Chief of Police Cooper stated that as long as he was Chief, the plaintiff would *"never work full time."* He refused to provide the plaintiff with any explanation, and instead only stated, *"over my dead body will you ever work full time."***

10) **The plaintiff repeatedly expressed an interest in working bike patrol after the officer who previously held the position left the department. Initially, defendant Chief of Police Cooper advised the plaintiff that she could have the position. Notwithstanding, in the spring of 2004, defendant Chief of Police Cooper hired a part-time male police officer [who also worked part time at the Great Barrington Police Department] for the bike patrol position. When the plaintiff protested and asked defendant Chief of Police Cooper why he had failed to follow through and appoint her to the bike patrol position, defendant Chief of Police Cooper stated that it was *"because she had taken***

8

*the job in Lenox.*" At this, the plaintiff reminded defendant Chief of Police Cooper that he had approved this job. This did nothing to alter defendant Chief of Police Cooper's retaliatory and discriminatory action.

11) On June 4, 2004, the Drug Task Force [Pittsfield Police Department and MA State Police] offered the plaintiff a position. At the time, the West Stockbridge Police Department had a mutual aid agreement with the Drug Task Force that provided one officer as needed and when requested. The following day, defendant Chief of Police Cooper approached the plaintiff at work and screamed, *"Don't you ever fucking think you are working for the Drug Task Force! I told them you are not allowed to work for them. You are never going to work for them!"* The following Monday, June 7, 2004, defendant Chief of Police Cooper again approached the plaintiff and stated that he did not have the funds to pay her to work with the Drug Task Force. In response, the plaintiff advised defendant Chief of Police Cooper that the Drug Task Force would pay her directly, and that she would only work on the days she was off from duty at the West Stockbridge Police Department. At this point, defendant Chief of Police Cooper stated that he would talk to the Board of Selectmen, and at the same time explicitly forbade the plaintiff from communicating directly with the Drug Task Force about the job. Defendant Chief of Police Cooper concluded the conversation by stating, *"What am I, an idiot, to let you communicate with them directly."*

12) Also during the June 7, 2004 meeting, the plaintiff complained to defendant Chief of Police Cooper about his overall discriminatory treatment of her. As evidence, the plaintiff pointed out that in addition to the problems he was

causing her with respect to the job at the Drug Task Force, that defendant Chief of Police Cooper had failed to assign her the bike patrol, failed to approve outside employment which was causing her very serious financial problems, and that he created and/or approved of the sexually charged and hostile work environment at the police department. In addition, the plaintiff voiced her complaints that defendant Chief of Police Cooper had told her that she would, *"never be a full time officer in West Stockbridge,"* and the *"only way to get a day shift was over his dead body."* Defendant Chief of Police Cooper's response to her complaints was that, *"Life can be made so miserable a person will want to quit."*

13) As a follow-up, on July 28, 2004, the plaintiff questioned defendant Chief of Police Cooper about whether he had spoken with the Board of Selectmen about the position on the Drug Task Force. Defendant Chief of Police Cooper responded that he had not heard back from them, and as a result, he took that to mean, *"no, she could not take the job."*

14) Throughout her employment, the plaintiff was repeatedly denied requests to attend police training seminars, classes, educational workshops, and Tri-County Police Association monthly meetings. **On most occasions, when seminars, workshops and meetings were scheduled to take place, defendant Chief of Police Cooper scheduled the plaintiff for work, and allowed male officers [some with less seniority] to attend.**

15) **Throughout the plaintiff's employment, defendant Chief of Police Cooper refused to provide the plaintiff with proper police attire, which he provided to male police officers.**

For example, the plaintiff was forced to repeatedly work details in the rain without a raincoat. This left the plaintiff cold and soaked to the skin throughout entire work shifts. Defendant Chief of Police Cooper's response to her complaints was that a raincoat would have to be special ordered, despite the plaintiff's repeated insistence that she would wear a men's medium raincoat that was readily available. As a result of defendant Chief of Police Cooper's refusal to provide the plaintiff with a raincoat, the plaintiff was forced to compromise her duties because she was working under conditions in which she was soaking wet and cold. **The plaintiff's soaking wet appearance on these occasions also detracted from her appearance as a law enforcement professional.**

As another example, the plaintiff was provided with an old ill-fitting male police vest that had been nationally recalled, **when male police officers were outfitted with quality and correctly sized vests.** [This was a very serious danger, as female officers should never wear male vests because bullets can ricochet off the vest into a woman's face.] This caused the plaintiff's appearance to be awkward and less professional than the other officers, which was demeaning to her as a police officer.

As another example, defendant Chief of Police Cooper provided the plaintiff with a duty firearm that did not work properly. It fired debris back into her face and jammed. A Firearms Instructor at Smith & Wesson Firearms Academy advised

the plaintiff that the gun was not working properly, and that she could not use it. The Instructor was shocked that the gun had been assigned to the plaintiff in its condition. Defendant Senior Officer Simonelli lent the plaintiff a smaller caliber gun until defendant Chief of Police Cooper provided the plaintiff with a replacement gun two to three months later.

**In addition, defendant Chief of Police Cooper gave strict instructions to the plaintiff <u>not</u> to wear her duty belt while working traffic detail, despite the fact that all male officers wore duty belts while working traffic detail.** This caused the plaintiff to appear less professional than the male officers. When the plaintiff questioned defendant Chief of Police Cooper about his instruction, his only response was that there was *"no need"* for the plaintiff to wear it.

16) Throughout the plaintiff's entire period of employment, she was a hard working force within the West Stockbridge Police Department. The plaintiff repeatedly expressed her willingness to work any shift available and to do whatever was asked of her as a police officer. Notwithstanding, her initiative and dedication were completely ignored by defendant Chief of Police Cooper. For example, out of 19 arrests made during the course of her employment, the plaintiff made 15; out of 30 criminal applications, the plaintiff initiated 25. As a direct result, the plaintiff provided most of the evidence, including drug evidence. **Notwithstanding, a part-time male officer with less experience was appointed to the position of Evidence Officer, despite the fact that he did not even want the position.**

17) Throughout her entire period of employment, defendant Chief of Police Cooper treated the plaintiff as though she was not capable or intelligent simply because she was a woman.

For example, in the spring of 2004, when the plaintiff offered to take evidence from one of her cases to the University of Massachusetts to be tested, defendant Chief of Police Cooper stated that he did *"not think she could handle finding the facility because the campus is too big and it is difficult to locate."* The plaintiff assured defendant Chief of Police Cooper that she was *"perfectly capable of locating the facility and delivering the evidence."* Defendant Chief of Police Cooper's only response was that the facility was *"kind of a secret location."*

As another example, whenever a small clerical error was made in the department by anyone, defendant Chief of Police Cooper would always refer to it as a *"Heidi."*

As another example, defendant Chief of Police Cooper required that the plaintiff submit typed "mini-reports" whenever she submitted a citation. All male officers were allowed to simply write on the back of the citation that was being submitted.

On another occasion, defendant Chief of Police Cooper told the plaintiff that she was not allowed to move to the Town of Lee, because she would just be another blonde *"Lee-tard" [Retard].*

18) Throughout her entire period of employment, all male officers were allowed to call defendant Chief of Police Cooper -- *"Karl,"* while defendant Chief of

Police Cooper specifically instructed and required that the plaintiff call him "*Chief*" at all times.

19) Despite the fact that the plaintiff had attended the part-time police academy, had received fire academy training, was a Certified E.M.T., had a B.A., and had more training and experience overall than the other part-time male employees, including the defendant Senior Officer, defendant Chief of Police Cooper regularly degraded, criticized, demeaned, humiliated, and discriminated against the plaintiff in the workplace because of her gender.

14.  *After being hired and throughout the course of her employment, the plaintiff was subjected to sexual harassment and a sexually hostile work environment. A background summary of some of the incidents is as follows:*

1) Throughout the plaintiff's entire period of employment, defendant Chief of Police Cooper and other male police officers employed by the West Stockbridge Police Department regularly talked about strippers and strip clubs while at work. On many occasions, defendant Chief of Police Cooper would ask male officers to go to strip clubs with him. On each occasion, the plaintiff was forced to physically leave the area, and at times voiced her protest to defendant Chief of Police Cooper that the conversations were offensive and disgusting, and that this type of discussion made her seriously distressed, caused her embarrassment, was awkward, and upset her very significantly.

2) As an example, on September 14, 2003, defendant Chief of Police Cooper, Officer Tenney, Officer Montgomery, and the plaintiff were standing in the

station talking about work matters. During the discussion, defendant Chief of Police Cooper began talking about strippers -- referring to them as *"good girls"*, and strip clubs -- referring to them as the *"ballet."* Due to the offensive nature of the discussion, the plaintiff shook her head, and stated that she had "heard enough," and physically excused herself.

3) Despite the plaintiff's repeated protests, the sexually hostile and sexually charged work environment continued on a very frequent and consistent basis.

4) From February/March 2003 through the summer 2004, defendant Senior Officer Simonelli would often come into the station, approach the plaintiff and remark *"mmm...smell good."* He would also often remark, *"you would go out with me"*, and comments of this nature. Defendant Officer Simonelli also quite often ran his fingers though the plaintiff's hair, hugged her, rubbed her head, rubbed her back, and touched her. On each and every occasion, the plaintiff physically moved away, physically froze, and protested his conduct. The plaintiff was disgusted to say the least. On frequent occasions during the plaintiff's initial training period, defendant Officer Simonelli would comment that we -- *"should go get ice cream and bring it to a hotel, where I will eat it off of you."* The plaintiff was shocked by these comments from her Senior Officer, and ignored them in fear that she would lose her job.

5) On another occasion, defendant Officer Simonelli asked the plaintiff if she was going to have any more children, and then commented *"Because, I don't want to get you pregnant, but I wouldn't mind warming you up."*

6) On another occasion, defendant Officer Simonelli remarked, *"Don't worry about not having a raincoat, you look good when you're wet."*

7) When the plaintiff repeatedly complained to defendant Chief of Police Cooper about these repeated sexually charged and unwelcome remarks and actions, defendant Chief of Police Cooper's only response was to dismiss and/or ignore the complaints.

8) Also on an occasion during the summer of 2003, while the plaintiff was working at her computer desk, she felt someone's presence really close to her. When she spun around, to her horror, she discovered defendant Chief of Police Cooper leaning over her and smelling her hair. The plaintiff was in shock and did not know what to do.

9) On January 3, 2004, the plaintiff was working alone in the station with defendant Chief of Police Cooper while he was talking about sexual assault victims. During the discussion, he stated that he remembered when *"no, used to mean maybe, in order for the modest women to save face."* The plaintiff expressed how completely inappropriate his comment was given his position as Chief of Police, and the fact that he was talking about sexual assault victims. During that same conversation, defendant Chief of Police Cooper stated, *"The best place to pick up women is by the bathroom. They're all so drunk and will go home with you."* This conversation made the plaintiff physically sick to her stomach.

10) In general, women were an open discussion in the police station, among defendant Chief of Police Cooper and the male police officers. Defendant Chief of Police Cooper would repeatedly ask the plaintiff, *"I am a good looking guy. Don't you think so Heidi?"* This question often followed a one sided conversation by defendant Chief of Police Cooper regarding his ex-wife -- often a topic, which included comments of bitterness toward women in general, such as how unfaithful they are. All of these topics and remarks made the plaintiff increasingly uncomfortable in the sexually charged and hostile work environment at the Town of West Stockbridge Police Station.

11) In August 2004, defendant Chief of Police Cooper verbally abused and berated the plaintiff for a period of approximately two hours in the station. He made wild accusations and barraged her with insults. He repeated, *"the whole town hates you, the State Police hates you, and that even your back-up hates you."* At one point, defendant Chief of Police Cooper and the plaintiff walked outside the station. While standing outside, defendant Chief of Police Cooper moved physically close to the plaintiff and then reached up and placed his thumb on the inside of her shirt collar and proceeded to rub his thumb against her neck. The plaintiff physically recoiled, froze, and then walked away. The plaintiff proceeded to walk across the street to a store where she broke down crying while telling the storeowner what the defendant Chief of Police had just done to her.

12) One evening after Thanksgiving 2004, defendant Senior Officer Simonelli responded to a theft call and then left the station after his shift, leaving the

plaintiff to do the investigation. The plaintiff performed the investigation, interviewed the parties involved, located the stolen goods, and located the thief. Defendant Officer Simonelli then instructed the plaintiff to call defendant Chief of Police Cooper in order to get permission to arrest the suspect and retrieve the stolen goods. In turn, the plaintiff telephoned defendant Chief of Police Cooper. When defendant Chief of Police Cooper failed to answer the call, defendant Officer Simonelli advised the plaintiff to page defendant Chief of Police Cooper. The plaintiff followed this instruction by entering the police station number so that defendant Chief of Police Cooper would be alerted to call the station. A short time later, defendant Chief of Police Cooper called the station. **While the plaintiff attempted to explain the situation, defendant Chief of Police Cooper interrupted the plaintiff and asked why she had put a *"69"* on his pager. At the time, defendant Chief of Police Cooper sounded as though he had been drinking and kept insisting in a sexually provocative voice that the plaintiff had put a *"69"* on his pager. He also stated that he *"was interested in her,"* and insinuated that she *"was offering."* Defendant Chief of Police Cooper's voice was soft and low while asking about the *"69",* which made the plaintiff's stomach turn. The plaintiff, insisted that she had done nothing of the sort, and stated that if she had put a *"69"* on his pager, how would he know to call the police station. The plaintiff attempted to continue to do her job by informing defendant Chief of Police Cooper about the details of the theft, but defendant Chief of Police Cooper just hung up the phone and said**

that he would deal with it the next day, leaving the plaintiff extremely upset and completely disgusted.

13) In response to the *"69"* incident, the plaintiff left a letter of complaint at the police station for defendant Chief of Police Cooper, which stated that she felt that she deserved to be treated like a professional, and that it was disgusting and vulgar to ask her about the alleged *"69"* on his pager. On information, after defendant Chief of Police Cooper received this letter, he met with defendant Town of West Stockbridge Board of Selectmen Larry Tonini and Curt Wilton. During the meeting, defendant Chief of Police Cooper admitted to the conversation with the plaintiff about the *"69"*. Defendant Town of West Stockbridge Selectman Wilton was able to establish that the *"69"* had been placed on defendant Chief of Police Cooper's pager hours before the plaintiff was even on shift and had no connection whatsoever with the page she made concerning the theft. Both defendant Town of West Stockbridge Selectmen Wilton and Tonini established that the pager was in good working order and expressed their concern to defendant Chief of Police Cooper.

15.     On September 13, 2004, the plaintiff went to the defendant Town of West Stockbridge Board of Selectmen in order to file a complaint against defendant Chief of Police Cooper for his discriminatory treatment. During an open meeting, the plaintiff voiced her concern and stated that she felt discriminated against. The plaintiff was not allowed to provide any substantial evidence to support her claims because defendant Town of West Stockbridge Selectman Larry Tonini raised his

arms, stated he had heard enough, and that the conversation would continue in a closed meeting with defendant Chief of Police Cooper present. The plaintiff was however advised by the defendant Town of West Stockbridge Board of Selectmen that defendant Chief of Police Cooper had never spoken with them about her loss of health insurance and her request for health insurance coverage through the Town.

16.    Throughout the following week, the plaintiff was forced to work under extremely distressing and tense conditions. Defendant Chief of Police Cooper made the plaintiff fully aware through his acts of intimidation that he was extremely angry that she had lodged complaints against him with Town authorities. The entire week involved daily acts of intimidation and threatening conduct directed at the plaintiff by defendant Chief of Police Cooper. It had its intended toll by silencing her with regard to her more serious and egregious complaints.

17.    On September 20, 2004, when the meeting convened with the defendant Town of West Stockbridge Board of Selectmen, defendant Chief of Police Cooper appeared in full uniform, gun and all, despite the fact that he was not on duty. He sat directly next to the plaintiff in an open and obvious attempt to intimidate her from speaking freely about her complaints of discrimination, sexual harassment, and a sexually hostile and sexually charged work environment. The plaintiff was too intimidated by the defendant Chief of Police to air her serious grievances and complaints about him and department personnel. The plaintiff feared further retaliation and harsh vengeful actions in the workplace by defendant Chief of Police Cooper and the other male officers. The meeting overall was not a safe environment to discuss the

**plaintiff's very serious complaints. Moreover, the defendant Town of West Stockbridge Board of Selectmen appeared unconcerned, and were not taking the plaintiff seriously as they rushed through some minor issues. Needless to say, defendant Chief of Police Cooper chilled the plaintiff to the point that she was not able to air the more serious grievances, as she feared retribution.**

A few minor matters were discussed at the meeting, which had been agreed to in advance, such as the lack of a raincoat and the loss of health insurance. These matters were addressed, remedied, and yet dismissed as petty. Notwithstanding, the defendant Town of West Stockbridge Board of Selectmen failed to understand the gravity of the situation, and the discriminatory treatment and practices that were occurring on a daily basis at the police department. Due to the intimidating atmosphere created by the defendants, the plaintiff was unable to voice her very serious complaints involving sexual harassment, a sexually hostile and sexually charged work environment, and discriminatory practices that prevailed within the police department.

After a two and a half hour meeting, the real issues still had never even been raised or addressed. Instead, the defendant Town of West Stockbridge Board of Selectmen advised the plaintiff that her complaints would have to be addressed at a later date and adjourned the meeting.

18.    The plaintiff was forced to undergo another distressing week at work. She was faced with exceptionally rude and hostile comments and conduct every time she was in defendant Senior Officer Simonelli's presence. On one occasion, defendant Officer Simonelli approached the plaintiff with his arms flailing and screamed at her in a threatening, intimidating and coercive manner, "I don't need any of this shit! I already had one sexual

harassment lawsuit against me at the jail. I don't need another one!" In addition, defendant Chief of Police Cooper was rude, hostile, threatening and intimidating to the plaintiff in all of his actions.

19.  On September 27, 2004, the plaintiff attended another open Board of Selectmen meeting in order to request the policies and procedures for filing a more formal complaint. The plaintiff advised the defendant Town of West Stockbridge Board of Selectmen that she wanted to present additional complaints that needed to be addressed. Defendant Town of West Stockbridge Selectman Larry Tonini advised the plaintiff that she was wasting the defendant Board of Selectmen's time, and that they could not be bothered. Defendant Selectman Tonini became so angry that he grew red in the face. In turn, defendant Town of West Stockbridge Town Manager Mark Webber asked the plaintiff what she wanted. When the plaintiff advised defendant Manager Webber that she simply wanted the policies and procedures because she wanted to file a formal complaint, he responded by saying, *"I told you nine times. We'll get back to you."* When the plaintiff inquired when he would get back to her, defendant Town of West Stockbridge Selectman Tonini responded by instructing the plaintiff <u>not</u> to attend another Board of Selectmen meeting unless she was invited. At this, defendant Town of West Stockbridge Selectman Curt Wilton interrupted defendant Selectman Tonini, and offered to provide the plaintiff with a paid leave of absence because the workplace was obviously too hostile an environment. The plaintiff stressed to the defendant Town of West Stockbridge Board of Selectmen that she just wanted to be treated like a professional and to work as a police officer.

Notwithstanding, the defendant Town of West Stockbridge Board of Selectmen convinced the plaintiff to take a paid leave of absence.

20. **On October 4, 2004, defendant Town of West Stockbridge Selectman Tonini telephoned the plaintiff to inform her that the town attorney had *"declared it illegal for her to be on paid leave of absence,"* and as a result, the plaintiff *"had to return to work that following Wednesday."***

21. When the plaintiff returned to work that Wednesday, she was subjected to severe retaliatory treatment for complaining of the defendants' discriminatory practices. Defendant Chief of Police Cooper and defendant Officer Simonelli subjected the plaintiff an increasingly hostile, threatening and intimidating work environment in violation of her civil rights.

22. The plaintiff also discovered that defendant Chief of Police Cooper had presented one of her cases in court, and had misrepresented the facts contained in the police report. As background, the plaintiff broke up an underage party with alcohol. The plaintiff had charged the minors with possession of alcohol as they had been drinking and there were open beer cans strewn everywhere. Although all of these facts were clearly printed in the report, defendant Chief of Police Cooper testified that there was only one beer can between the twenty youths. Defendant Chief of Police Cooper told the plaintiff that the criminal charges had been dropped. As a result, the plaintiff was made to look incompetent. This was not the first time that defendant Chief of Police Cooper intentionally sacrificed the duties of his job in order to harm the plaintiff's reputation as a law enforcement professional.

23.     Also during this time period, defendant Town of West Stockbridge Town Manager
        Webber was quoted in the newspaper as claiming *"the complaint Officer Teutsch made
        had nothing to do with discrimination, sexual harassment or money."* When the plaintiff
        asked the defendant Town of West Stockbridge Board of Selectmen why private
        personnel matters [that were factually incorrect] discussed in an Executive Session meeting
        had been disseminated to the press, Town Manager Webber's only response was that he
        was tired of the paper hounding him, and that he would see to it that there would be a
        correction in the paper. No correction has appeared to date.

24.     During a second Executive Session meeting of the Town of West Stockbridge Board of
        Selectmen the plaintiff raised three matters.

        **At the outset, the plaintiff initially advised the Board of Selectmen that she was
        being docked pay because defendant Chief of Police Cooper had arranged the
        meeting to take place during one of the few shifts she was scheduled to work.
        Defendant Town of West Stockbridge Selectman Curt Wilton responded by stating
        that it was a punishment for making the complaint. After a debate between the
        Selectmen, an agreement was reached that her pay would not be docked.**

        Second, the plaintiff made a request that the statement Town Manager Webber had made
        to the press be corrected. The Selectmen agreed that a correction would be made. The
        correction was never made.

        **Third, the plaintiff made a request for a copy of the policies and procedures,
        guidelines or steps, she would need in order to file a formal complaint because the
        venues provided by the defendants for airing her complaints up through that time**

were too intimidating and hostile. The defendant Board of Selectmen advised the plaintiff that no policies existed.

25.    In November 2004, the Town adopted a no sexual harassment and discrimination policy, and also a no retaliation policy. Notwithstanding, defendant Chief of Police Cooper refused to post these policies at the Police Department, and stated that he did not have the "space" to post them.

26.    Despite these new policies, defendant Chief of Police Cooper retaliated against the plaintiff by creating a shift that had until this point in time never existed on Thanksgiving. He gave himself and the other male officers the day off, while creating a 12:00 PM to 9:00 PM shift for the plaintiff. Defendant Chief of Police Cooper also paid himself for that shift, despite the fact that he did not work at all on Thanksgiving.

27.    **By this point, daily work at the police department had grown so intolerable that the plaintiff could no longer function in the workplace. She was greeted daily with an even more hostile, threatening, intimidating and coercive environment than she had prior to the filing of her initial complaint with the defendant Town of West Stockbridge Board of Selectmen. Defendant Chief of Police Cooper and defendant Senior Officer Simonelli were rude, hostile, threatening and intimidating in all of their daily interactions with the plaintiff.**

28.    As a direct result of the discriminatory treatment, sexually hostile and sexually charged work environment, continued sexual harassment, and retaliatory conduct, the working conditions at the police department were so intolerable that the plaintiff was left with no choice but to resign effective December 8, 2004. **In her December 8, 2004 letter to**

25

**defendant Chief of Police Cooper, plaintiff detailed that** *"As a direct result of your discriminatory treatment of me and continued sexual harassment, you have made my working conditions at the police department so intolerable that you have left me with no choice but to resign effective immediately."*

29.    Shortly afterward, the plaintiff received a letter from the defendant Town of West Stockbridge Board of Selectmen that stated that they saw no merit to her claims. Selectmen Liz Digrigoli and Larry Tonini both signed the letter. Defendant Selectman Curt Wilton did not sign the letter.

30.    On the morning of December 9, 2004, the plaintiff went to the West Stockbridge Police Department in order to clean out her locker of personal belongings. The locker was empty. To this day, none of the plaintiff's personal belongings have been returned to her.

31.    After the plaintiff's termination, she continued to attend criminal court on behalf of the Town of West Stockbridge Police Department in order to testify with respect to OUI cases that she was involved in during her period of employment. The plaintiff was never paid for any of this work performed.

32.    Since the plaintiff's constructive termination, defendant Chief of Police Cooper continued his threatening, intimidating, and retaliatory conduct. For example, on or about March 1st or 2nd 2005, defendant Chief of Police Cooper [in a defendant Town of West Stockbridge police vehicle] tailgated the plaintiff's vehicle in an extremely close and dangerous manner from Main Street in West Stockbridge halfway to the elementary school located in the Town of Richmond, which is outside of his jurisdiction.

33.    As a direct result of the sexual harassment, sexually charged and sexually hostile work environment, illegal, ·discriminatory, hostile and retaliatory actions, as well as the constructive termination, plaintiff Teutsch, suffered and continues to suffer severe emotional distress and mental anguish, public embarrassment, degradation and humiliation, loss of enjoyment of life, and loss of salary and benefits.

V.    **CAUSES OF ACTION**

      **COUNT I:**    ***SEX DISCRIMINATION***
               **VIOLATIONS OF TITLE VII -- 42 U.S.C. § 2000e-2(a) &**
               **M.G.L. CHAPTER 151B**

34.    Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 33 of this Complaint, as though fully set forth herein.

35.    As a direct and proximate result of the actions of the defendants, plaintiff Teutsch was subject to unlawful and discriminatory employment practices because of her gender in violation of Title VII  & M.G.L. Chapter 151B.

36.    As a result of the defendants' unlawful and discriminatory employment practices because of her gender, the plaintiff was forced to resign her employment with the defendant. This resignation was caused by the defendants' discriminatory employment practices that rendered the plaintiff's work environment intolerable so that no reasonable woman would have remained employed by the defendant.

37.    As a result of the acts of the defendants, the plaintiff suffered and will continue to suffer a loss of salary and benefits, emotional pain and suffering, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional distress and physical distress

27

38.   The plaintiff is thereby entitled to damages and relief pursuant to Title VII -- 42 U.S.C. § 2000e-2(a) and M.G.L. Chapter 151B.

### COUNT II:  *SEXUAL HARASSMENT* VIOLATIONS OF TITLE VII -- 42 U.S.C. § 2000e-2(a) & 3 & M.G.L. CHAPTER 151B

39.   Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 33 of this Complaint, as though fully set forth herein.

40.   As a direct and proximate result of the actions of defendant Chief of Police Cooper and defendant Senior Police Officer Simonelli, plaintiff Teutsch was subject to inappropriate and unwelcome sexual behavior and a sexually hostile and sexually charged work environment. The defendants' failure to take any steps to stop the behavior, despite repeated complaints by the plaintiff, amounted to condonation, ratification, approval, and perpetuation of the defendants' sexual behavior and the sexually hostile and sexually charged work environment.

41.   By creating, condoning, and perpetuating a sexually hostile and sexually charged work environment, the defendants have intentionally and with reckless indifference violated Title VII.

42.   Sexual harassment by an employer violates M.G.L. Chapter 151B § 4. The repeated unwelcome sexual advances and comments created an intolerable, offensive and hostile working environment. This sexual harassment violated M.G.L. Chapter 151B, and its prohibition against sexual harassment and discrimination, caused the plaintiff to be constructively terminated from her employment with the defendants.

28

43.    As a result of the defendants' inappropriate and unwelcome sexual behavior directed at the plaintiff and creation of a sexually hostile and sexually charged work environment, the plaintiff was forced to resign her employment with the defendant. This resignation was caused by the defendants' humiliating and degrading conduct toward the plaintiff and rendered the plaintiff's work environment intolerable so that no reasonable woman would have remained employed by the defendant.

44.    As a result of the acts of the defendants, the plaintiff suffered and will continue to suffer a loss of salary and benefits, emotional pain and suffering, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional distress and physical distress.

45.    The plaintiff is thereby entitled to damages and relief pursuant to Title VII -- 42 U.S.C. § 2000e-2(a) & 3 and M.G.L. Chapter 151B.


**COUNT III: *RETALIATION FOR OPPOSING OR COMPLAINING OF DISCRIMINATION* VIOLATIONS OF TITLE VII -- 42 U.S.C.§ 2000e-3 & M.G.L. CHAPTER 151B § 4(4)**

46.    Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 33 of this Complaint, as though fully set forth herein.

47.    As a direct and proximate result of the actions of the defendants, plaintiff Teutsch was subject to retaliatory treatment, adverse employment actions, a hostile work environment, and constructively terminated from her employment because she opposed and complained of the defendants' unlawful and discriminatory employment practices, defendant Chief of Police Cooper and defendant Police Officer Simonelli's inappropriate and unwelcome

29

sexual behavior directed at the plaintiff, and the defendants' creation of a sexually hostile and sexually charged work environment.

48. The plaintiff is thereby entitled to damages and relief pursuant to Title VII -- 42 U.S.C. § 2000e-3 and M.G.L. Chapter 151B § 4(4).


## COUNT IV:  *VIOLATIONS OF THE MASSACHUSETTS CIVIL RIGHTS ACT* *M.G.L. CHAPTER 12 §§ H-I*

49. Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 33 of this Complaint, as though fully set forth herein.

50. As a direct and proximate result of the actions of the defendants, plaintiff Teutsch was subject to retaliatory treatment, adverse employment actions, a hostile work environment, and constructively terminated from her employment because she opposed and complained of the defendants' unlawful and discriminatory employment practices, defendant Chief of Police Cooper and defendant Police Officer Simonelli's inappropriate and unwelcome sexual behavior directed at the plaintiff, and the defendants' creation of a sexually hostile and sexually charged work environment.

51. The defendants' retaliatory actions and conduct against plaintiff Teutsch constitute the requisite "intimidation, threats or coercion" protected under the Massachusetts Civil Rights Act -- M.G.L. Chapter 12 § 11I.

52. The plaintiff was deprived of her rights secured by the Massachusetts Constitution, and, as such, is entitled to damages and relief pursuant to M.G.L. Chapter 12 §§ 11 H-I.

30

## COUNT V:   *ASSAULT AND BATTERY*

53.   Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 33 of this Complaint, as though fully set forth herein.

54.   Defendant Chief of Police Cooper and defendant Police Officer Simonelli did unlawfully commit an assault and battery against the plaintiff in violation of Massachusetts common law.

## COUNT VI:  *RECKLESS AND/OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

55.   Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 33 of this Complaint, as though fully set forth herein.

56.   Defendant Chief of Police Cooper and defendant Senior Police Officer Simonelli, by their sexual misconduct, sexual harassment, creation of a sexually hostile and sexually charged work environment, retaliatory conduct, together with the defendants' unlawful and discriminatory employment practices and constructive termination of the plaintiff, caused the plaintiff to suffer severe emotional distress, pain and suffering, mental anguish, and anxiety of such severity and nature that no reasonable person could or should be expected to endure, and the defendants knew or should have known that their acts would cause such emotional distress, pain and suffering, mental anguish, humiliation and embarrassment. Further, said emotional distress, pain and suffering, mental anguish, and anxiety was recklessly and/or intentionally inflicted.

**WHEREFORE**, the plaintiff, Adelheid (Heidi) Teutsch prays that this Court enter judgment on her behalf and:

1.  Award appropriate compensatory damages to plaintiff Adelheid (Heidi) Teutsch from the defendants jointly and severally in an amount to be determined by the court;

2.  Award punitive damages to plaintiff Adelheid (Heidi) Teutsch from defendant Chief of Police Karl G. Cooper, Jr., and defendant Police Officer Charles Simonelli;

3.  Award the plaintiff costs, interest and attorneys' fees.

4.  Award such other relief as this Court deems just, equitable and appropriate.


### THE PLAINTIFF HEREBY DEMANDS A JURY TRIAL


DATED: September 9, 2005

Respectfully submitted,
The Plaintiff
By Her Attorneys,

Joan A. Antonino
BBO#547319

Charles J. DiMare
BBO#124820
ANTONINO & DIMARE
Post Office Box 3333
Amherst, MA 01004-3333
(413) 549-5330

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I (a) PLAINTIFFS
Adelheid ( Heidi) Teutsch

## DEFENDANTS
Karl G. Kooper, Jr., Chief of Police, Charles Simonelli, Police Office, Town of West Stockbridge

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Berkshire
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT Berkshire
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

05 - 30199 - KPN

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Federal Bar No. 547317; 124820
Joan A. Antonino/Charles J. DiMare
ANTONINO & DIMARE
P.O. Box 3333, Amherst, MA 01004
413-549-5330

ATTORNEYS (IF KNOWN)
Federal Bar No.

## II. BASIS OF JURISDICTION (PLACE AN × IN ONE BOX ONLY)
- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN × IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Title 42 USC § 2000e    Cause of Action:
Sex Discrimination, Sexual Harassment, Retaliation

## V. NATURE OF SUIT (PLACE AN × IN ONE BOX ONLY)

CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability

REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

TORTS
PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury— Med Malpractice
- ☐ 365 Personal Injury— Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

CIVIL RIGHTS
- ☐ 441 Voting
- ☒ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Other

FORFEITURE/PENALTY
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

OTHER STATUTES
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions

## VI. ORIGIN (PLACE AN × IN ONE BOX ONLY)
- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION ☐ UNDER F.R.C.P. 23
DEMAND $
Check YES only if demanded in complaint:
JURY DEMAND: ☒ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):
JUDGE _____ DOCKET NUMBER _____

DATE 9/9/05
SIGNATURE OF ATTORNEY OF RECORD  Joan A. Antonino

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) _Adelheid (Heidi) Teutsch v. Karl G. Cooper, Jr._

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

| | | |
|---|---|---|
| ☐ | I. | 160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT. |
| ☒ | II. | 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.     *Also complete AO 120 or AO 121 for patent, trademark or copyright cases |
| ☐ | III. | 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891. |
| ☐ | IV. | 220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900. |
| ☐ | V. | 150, 152, 153. |

05 - 30199 - KPN

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

N/A

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
    YES ☐     NO ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)
    YES ☐     NO

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
    YES ☐     (NO)

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
    YES     (NO)

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
    (YES)     NO ☐

A. If yes, in which division do all of the non-governmental parties reside?
    Eastern Division ☐     Central Division ☐     Western Division ☒

B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
    Eastern Division ☐     Central Division ☐     Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
    YES ☐     NO ☒

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME _Joan A. Antonino & Charles J. DiMare_
ADDRESS _P.O. Box 3333, Amherst, MA 01004_
TELEPHONE NO. _(413) 549-5330_

(CategoryForm.wpd - 5/2/05)